1537.10, 1537.69, Dry County Wholesale v. Labatt USA Operating Co, LLC, at all, or argument not to exceed 15 minutes per side, Mr. Alexander, for the Plaintiff Appellant's Cross-Examination. May it please the Court, my name is David Alexander, my colleague Chris Haas and I represent the Appellant Dry County Distributing and Iron City Distributing. In granting a stay of its own judgment on summary judgment, the District Court made two very important observations. One, I must confess, it's not been my typical experience that a judge will often stay his own order, particularly in a declaratory judgment action, but he did. He said, this case presents serious, novel questions of statutory interpretation, and the ruling at issue has the irrefutable potential to change dramatically the landscape for beer distribution in Ohio. He was right on both fronts. The Franchise Act provisions at issue here, we respectfully submit, should be and fundamentally the purpose of the statute. So why did the judge say novel and potential for dramatic change? Very simply, because this is the first time in 23 years of the existence of this statute where it has been applied, where the statutory manufacturer, which is here, Labatt USA Operating, did not change as a result of the transaction. There was no change. That was a first. And secondly, as the Court recognized with respect to the potential for, as he put it, irrefutable potential for dramatic change in the industry, again, the answer is straightforward. He was keenly aware, because after the summary judgment ruling, he heard the evidence in the diminished value proceeding on what this likely would result in, in the industry in Ohio. And that was an accelerated and immediate consolidation of the industry. So that a statute that had been drafted by everyone's admission as a protective tool for distributors would become a sword to force consolidation quickly. It wouldn't be a sword, it would just take the shield away and leave it to the operation of other forces. Well, but is that plausibly reconcilable with the purpose of this statute? And we respectfully suggest it is not. It was to help the Ohio beer distributors. That's right. And as this Court has previously recognized in the Miller Coors decision, that was clearly the purpose of the statute. So, two questions. First, do you think that means that we ought to, for example, certify to the Ohio Courts? Or should we go ahead and decide it? We believe you should exercise your discretion to certify it. We asked Judge Marbley to do so. What did he say? He declined to do so. And you might wonder... Did one side agree to that? No, the other side did not agree to that. There is, by the way, another case pending in the same district before Judge Watson in which we've also sought certification. Let me ask you this then. This is just an intuition. I haven't thought it through chapter and verse. But it seems to me that it wouldn't take a brilliant corporate lawyer to restructure this deal in a way that Labatt USA, in fact, was transferred. So, I mean, it's true that your argument is, well, there are these hierarchies upon hierarchies and they only dealt with it at the top. But I don't see why, and explain to me, it would have been all that difficult if it turned out, oh, if that's Mr. Alexander's argument, fine, we will simply take Labatt USA and sell it intact to the other side. Is there a corporate law reason that this has to be done this way? Not to my knowledge, Your Honor. Okay. So then, all of your arm-waving about the rights of the great Ohio distributors, it was just a matter of corporate drafting. Now, maybe that would be something that you could prevail on, but it doesn't seem to undercut the policy argument. If we were to buy your argument solely on that basis, then all of these people that you say want to consolidate the Ohio beer industry would just get better corporate lawyers and do it right. Your Honor, I will concede it is possible that a transaction could have been structured differently. Why it couldn't? Tax reasons? Warrant reasons? Regulatory reasons? I don't know, Your Honor, but what I do know is that the Ohio legislature knew how to speak broadly when it wanted to. For example, in this very statute, in another provision, it talked about either the manufacturer or its subsidiaries, or persons with financial affiliation to it. But there's no such broad language in this provision, that issue, 85D. Here, it used the defined term in the statute from 82B, and that term was manufacturer. And all we are saying is the plain language of the statute calls for a look at what 82B says about what a manufacturer is. And 82B, both in its own terms, and 83 in providing its imposition of a duty by the manufacturer to offer a contract, all of those provisions read together quite clearly show that the manufacturer, as that term is used in 85D, means one straightforward thing. It's the entity doing business in Ohio. The entity that has to enter into under 0.83 is required by law to enter into a contract with Ohio distributors. Costa Rica can't do that here, and it hasn't done that, either for our clients or for any other distributor in the state of Ohio. Even though 0.83 imposes that duty on the manufacturer, Costa Rica's never done it. Costa Rica has never filed a single designation of territory form as required by law. Costa Rica has never filed the appropriate permits under Ohio law. Who's done it? They're depending upon one of these subsidiaries that would have it, right? They're depending upon the Lobot USA operating company, which has not changed. And by their own admission, all of those duties that are required of the party in Ohio, by their own admission, that party has not changed. How can that be reconciled with a statutory provision that on its face contemplates a manufacturer acquiring, in the words of the statute, another manufacturer? If the manufacturer does not change by their own admission, how can we have the two manufacturers contemplated by the statute? We don't have them in this case. It's novel, as Judge Marbley said, because it's the first time it's ever been tried. Okay, I think I get the drift of that argument. Do others have questions on that? It's up to you. Do you want to go to the money part, or do you want to stick with this? Your time's running, that's it. Well, I'd like to stick with this for a couple more points, if I may. I just didn't want to ignore it if you wanted to go to money. Go right ahead. Certainly, certainly. Let me ask you, has any court in Ohio said the law is the way that you're saying here, that it doesn't involve a manufacturer per se, but it's under control? Well, that's their position, that the only thing that matters is control. What have the Ohio courts said? The Ohio courts have, with some consistency, said two things. One, because the word successor manufacturer isn't defined in D, what does it mean in the statute otherwise? So several have looked to the definition in 8.2b. What does a manufacturer mean? What I've called the statutory manufacturer. But more importantly, what most Ohio courts have said is in order to understand D and what it means there, you have to look at B.4 or B.2. Those are the so-called shield provisions. So that even if you have a transaction that fits under 8.5d, you still have to look at the shield provisions. What are the shield provisions? If the first manufacturer transfers to a second manufacturer, in the words of the statute, over which it exercises control, then even though, as Judge Graham put it, on paper there may be a D transaction, it can't be a successor manufacturer because it would directly contradict what was provided for in B.4, sometimes in B.2. So those shield provisions in B.2 and B.4 have been looked to to understand what the word successor might mean in D. Let me see if I follow that. You're saying that because of those provisions, a supplier can't get out of its obligations by simply shifting it to another shell that it controls. That's what B.4 says. Okay, but I understand that. But that's not what's happening here. It's not. There is real control being changed, but the entity at the bottom of the chain isn't changing. Is that the difference? That's right. Control has changed. We've never disputed that. We've never suggested that it was a B.4 transaction, that it went to a party who controlled it. What we've consistently said is it's not a successor manufacturer. Let me shift to something else, which is, is there a reason that you brought this in federal court? If you think maybe the Ohio courts, state courts, would get it more right? Your Honor, I've been doing this work for probably 15 years and probably half the cases in Ohio, and the other half might have Jim's name on them. So you guys have been at this bar? We've been at this bar, and we're good friends. But what we know is that these cases often end up in federal court because there's diversity of citizenship. And because I'm often seeking an injunction, I don't want to get hung up on remand issues. If you had gone to state court, do you think you would have been in federal court? I would have faced significant risk. That's a perfectly good answer. So I think I'm on my first round of time. So are there any other questions? That's fine. We'll talk money eventually. All right. Thank you. You have your time. Good morning. May it please the Court. My name is James Niehaus. I represent the appellees, which is North American Breweries, Labatt USA, and Cerveceria Costa Rica. I have to disagree with Judge Marbley on a few things, and one is that this is so novel. It really isn't. As far as what is the definition of successor manufacture, it's not in the statute, but the courts have addressed it. In fact, this court addressed it. In the beverage distributors case where it said Section 133385D identifies a successor manufacturer as one who acquires all or substantially all of the stock or assets of another manufacturer through merger or acquisition or acquires or is the assignee of a particular brand or product or brand of alcoholic beverage from another manufacturer. They refer to that as a definition. They define successor manufacturer as the entity that acquires. Now, an interesting part, they quoted the statutory language. In that sentence fragment that this court quoted in the beverage distributors case, the word or appears six times. The legislature tried to draft the language very broadly to encompass all manners of transactions that corporate lawyers could dream up because the legislature wanted all different types of transactions brought into this part of the statute. And that's because they wanted to make sure that distributors were going to be compensated when they lose the brands. Now, the statute has been interpreted as one designed to protect distributors. But when the Ohio Supreme Court was asked to interpret Section 85D, it said it's clear and unambiguous. It allows the successor manufacturer, the new owner, to come in and assemble its own team of distributors. You know, the Ohio Supreme Court had a chance in that case to say, oh, no, no, we're going to interpret this narrowly. But they didn't. They interpreted it broadly. When the term successor manufacturer is used there, is there any requirement or understanding that it be a manufacturer previously? Or does it become a successor manufacturer by the fact that it's now manufacturing? It becomes a successor manufacturer. A candy company can buy the beer company, take over the beer company, and it becomes now a manufacturer. Exactly. And that was the Court of Appeals ruling in the Esber v. Labatt case. Judge Seiler, you asked what have the Ohio courts done. Well, there are at least three Ohio appellate court decisions that have addressed really the issue in this case, Esber v. Labatt. Where in that case, Labatt USA was formed specifically for the purpose of acquiring assets, the distribution rights for Labatt brands in the U.S. It was not a manufacturer. Esber argued, and the trial court agreed, because Labatt USA was not a manufacturer when it acquired the brands, it couldn't be a successor manufacturer. The Court of Appeals said no. You know, yes, if you read the language strictly, yeah, but that results in an illogical outcome. So the Court of Appeals there defines successor manufacturer as someone who manufactures or who is in the business of manufacturing. Manufacturer doesn't really mean what it says, what you're saying. In fact, if you look at the definition of manufacturer in the statute, it talks about an entity that manufactures or supplies. So, for an example, an importer can be a manufacturer even though it never manufactures. A distributor who sells the brands to another distributor in Ohio, under the statute, becomes the manufacturer even though it's also a distributor. The definition of manufacturer is pretty broad and includes not just those who are actually manufacturing, because Labatt USA doesn't manufacture. It buys the actual product. The actual product that it sells in Ohio is manufactured, some of it is manufactured by an affiliate, High Falls, which operates the old Genesee Brewery, and also actually by Molson Coors up in Canada. Wouldn't it be better for us to let the Supreme Court of Ohio decide this Ohio law case? I don't think so, Your Honor, and the reason why is I argued that issue in front of this court several years ago in the Superior v. Schefflin and Somerset case where the district court judge had abstained, saying this issue should be decided by state courts, and this court said that we have a duty to decide the case. We can decide it, and that's what Judge Marbley said. We can make this decision just as easily as a state court can make the decision, and this court did address it in the beverage distributors case. Another state appellate court decision that has addressed this issue is the Esber v. Heineken case. In that case, the entity from whom Esber was buying the beer was a company called, the acronym was SNIC, Smith & Newcastle Importer. It was an import company. That never changed, but four corporate levels up, Heineken acquired Smith & Newcastle from a different manufacturer. The courts, both the trial court and the court of appeals in that case, said that acquisition four levels up by Heineken was the successor manufacturer transaction, and what happened in that case is when Heineken changed the importer from Smith & Newcastle to another one, they said, well, that's where control changed, and the court said, no, control changed in the original Heineken acquisition, and that was the successor manufacturer transaction, and notice was too late in that case. Another appellate court decision, which just came down in January of this year, Premium v. Brew Kettle. In that case, the distributor argued that Brew Kettle could not be a manufacturer because Brew Kettle did not have the licenses. It's this very argument being made here that CCR doesn't have the licenses in Ohio, so it can't be the manufacturer. The court in that case said, no, we reject that argument. So I think, you know, the issue of whether CCR is a successor manufacturer, the law on that is clear in our favor. I would like to move on to the diminished value. And that boils down essentially to did the district court select the right discount rate to be used in the discounted cash flow, what we call the DCF method of calculating value. And our position is that, no, the trial court erred when he averaged the two experts' discount rates. You want a high equity capital structure because equity has a higher discount rate, and therefore you end up with a lower present value. Is that right? That's one way of articulating it, yes. Okay. Now, my question is, at page 58 or so of your brief, you have, to my mind, a very persuasive argument that the method of financing a purchase is irrelevant to the value of the asset being purchased. But if I buy that, then why does any of this fight matter? Why should we use your 93 and 7 as opposed to any other? Because you have an expert that picks one. Why shouldn't we look to, you know, external market rates or hedonic value or something different? Well, the 93-7 rate is an external. That is a market rate. That is what our expert calculated to be the industry average. Well, but it is still an industry average capital structure. Correct. So, in other words, if the method of financing is irrelevant as to the right discount rate, why is it important that the industry average is that? When you buy the piece of IBM stock, it doesn't matter what your capital structure is. It doesn't matter what me as the buyer, it doesn't matter what my capital structure is. And it also doesn't matter what the seller's capital structure is. But the capital structure of IBM does matter because that tells me what the risk is of IBM. If I'm going to buy a company that is 100% financed, that its capital structure is 100% debt, I know I'm buying a much riskier investment than if I'm buying a company that's 100% whose capital structure is 100% equity. And, in fact, the 100% debt is riskier? Sure. Because, well, help me. You lost me for the following reason, and maybe to point out where I'm wrong. If it's 100% debt, then, by what we just said, the discount rate is lower, the present value is greater, so you're paying more for this, quote, riskier company. Except you have to adjust in your calculation of the discount rate for the far riskier nature of the company. In putting together the discount rate. My math is what I thought. I thought you were going to flip the argument, so I've lost you there. Okay. When you're putting together a discount rate, you look at a number of factors, not just the weighting of the cost of capital. You're going to look at the size of the company. You're going to look at the type of business it's in. And, you know, those are all factors that go into assembling the discount rate. In this case, the two experts agreed on many of those factors. What they disagreed on was the weighting of the debt and equity portions of the capital structure. Okay. Well, help me there, then, because then maybe I just missed it in the math. I thought you had a projected stream of future benefits or revenues. You discounted that at a percentage that, if we did the math right, it was like, you know, the equity part was 20 percent roughly, the debt part was something like 3 percent, and you crunch it in. Now, are you saying that all of those other factors are what created the 20 percent and 3 percent? Yes. When you're calculating what is the debt portion, what percent do you put on the debt portion? You have to look at the size of the company as well as some other factors. The cost of debt would be lower for IBM than it is for Joe's startup. Exactly. The cost of debt for IBM, when IBM goes into the market to borrow money. I follow that, and I take it that that wasn't the major source of disagreement. No. Dr. Kirsch had come up with a cost of equity of about 25 percent. Mr. Sackman had calculated the cost of equity to be between 21 and 25 percent, so they were fairly consistent. I understand the statement then as to why those factors would affect the numbers, but going back to your original statement that when you buy a company that's 100 percent debt, that is far riskier. I'm saying, but why would you pay a lot more for such a company? I don't think you would pay a lot more for such a company. If you're buying a highly risky company, your discount rate is going to be higher because of the risk of the company. Well, but that's factored into the number that you assign for debt. It's factored in not only the number you assign for debt as well as the number you assign for equity. But you said 100 percent debt company has no equity. Correct. Equity is always going to be higher than debt, isn't it? I mean, 20 and 3 is a monstrous difference. I can't imagine that the experts would say that would swing, or are you telling me it would? Well, I'm not an expert in developing discount rates, so I can't tell you exactly why, but as the amount of debt goes up, you know, once you've established the discount rate based upon a weighting of a lot of equity and little debt, as the debt goes up, the risk level of the company is going to go up. And Mr. Sackman admitted that in cross-examination. You're not objecting to the qualifications of either expert, are you? That didn't have any dauber? No, no, no. Both were experts. Okay. You're just talking about the methodology. Well, it's not. It's a little different than the methodology. It is Mr. Sackman was not opining as to an industry average capital structure. The district court said, I'm going to use an industry average capital structure. Then he took Dr. Kirsch's industry average capital structure and averaged it with Mr. Sackman's, which was a buyer's capital structure, which was erroneous, and averaging the two reduced the discount rate. The result was that the district court, by lowering the discount rate in that way, the amount ultimately awarded for Tri-County, $2.7 million in diminished value, exceeds the amount that Mr. Sackman calculated Tri-County was worth in total. He had calculated Tri-County in total. The whole company was worth $2.3 million. The district court's award of $2.7 million in diminished value awarded more than the value of the entire company. Okay. Thank you. Did you reserve any time for rebuttal, which would be only on the cross-appeal? I did not. Fine. You're good. Mr. Alexander, last stand. Very briefly, Your Honor, I want to address the question you asked Judge Boggs on the candy store analogy. Can the statute be satisfied if you become a manufacturer? The answer under the case law is yes. We don't dispute that point. What we say here, and the record shows, Costa Rica has never become a manufacturer under any of the definitional requirements of the statute. It has never offered, as 8.3 requires, a contract to distributors. It has never filed a distributor designation form. Those stipulations, in fact, are in paragraphs 30, 31, and 32. To this day, it cannot meet the requirements of a statutory manufacturer, and therefore it cannot be the party under D which has the right to use the termination provision. In all the prior cases, it's been used by a new manufacturer who did all the things that the law requires. That's point one. Point two, Mr. Niehaus argued at length about the Esber case in the Supreme Court of Ohio. Two points. Number one, that case could not be more different on the facts and the law. Why? Because there the Supreme Court itself wrote it is not disputed that the new manufacturer was a manufacturer. It was not disputed, not even an issue in the case. When you said Esber, is that Esber v. Labatt? Esber v. It gets confusing, doesn't it? It's Esber v. Labatt. It's the Supreme Court case I'm referring to. Okay, the one that's 3 Northeast 3rd 1173. That's right. So there it was undisputed that there was a real successor manufacturer under the statute. That's what the court said. Here it's the central issue in the case. Is there a successor manufacturer? And in that case, the second manufacturer did everything that the statute requires. Offered contracts, filed designation forms, got a permit. All of those elements are required of somebody who's going to do business in Ohio, highly controlled area, in order to constitute a manufacturer. A Costa Rican company that has none of those relationships cannot possibly be the kind of manufacturer that Ohio has regulatory authority over. I'm almost out of time. So I want to ask, do you have questions of me on the discount rate? I want to address what's most important, or I can just go ahead and respond to a few points that were raised. Take your best shot briefly. All right. Dr. Kirsch acknowledged on cross-examination, which Judge Marbley pointed out, that it would be unusual to use the seller's capital structure. That makes common sense. If you're going to buy a house, why do you care what the seller's capital structure is? It doesn't have anything to do with the value of that property. Now, the other point, on the so-called average industry capital approach, respectfully, I would ask the Court if it could take the time to read the transcript of Dr. Kirsch on cross-examination there. This so-called theory was largely based not on data, which he acknowledged there, in fact, is no published data on industry average. There is no published data on it. He extrapolated from some limited data, made a series of assumptions, and then came to his theory on so-called industry average. In sharp contrast, Sekman took an entirely different approach. Sekman is a deal guy. He represents buyer and sellers. He's not an academic. He testified about what kind of capital structure he was seeing in the industry in actual transactions by people doing these deals. And with interest rates as low as they are, unsurprisingly, they're as highly levered as the buyer can make them. You're not complaining about the qualifications of either expert? No. No, I'm just saying that you want 65 debt, 35 equity, which gives you a low percentage and therefore a high present value. Unsurprisingly, we want these different views. Do you have a sort of short answer, though, as to if we're looking at the value of an entity, why does it matter the buyer or either side, but especially the buyer's structure? I'm looking at a piece of farmland, and we've got five buyers. One of them is 100% debt, one of them is 100% equity. The value of the farm is the market value of the farm. It's got nothing to do with the structure of any of these buyers. Your Honor, I couldn't agree with you more. And that's why we emphasized in the district court proceeding that what it ought to use is the multiple approach, which is what people doing deals in the industry actually use, a multiple of gross profits. Kirsch's was off the charts when you tested against. . . That's not what the judge ended up doing. He tested it with the multiple approach. He's the district judge. Yes, he's the district judge. Just to kind of wrap this up, so the multiple approach. . . Help me here. We've got a stream of future profits, and if I say, okay, I want 12 times future profits, that's going to be something like the full value of this year, 90% of next year, 80%,  Can't I do the math? If my bottom line number is 12 times profits, that's going to look a lot like the stream of profits at X discount rate. If I want 15 times profits, I can back out a different discount rate. Is that a fair statement? I think it is, or as Dr. Kirsch conceded on cross-examination, he often uses multiples to test the DCF. We'll read Kirsch's cross-examination. That's a fair point. Any other questions? Thank you, gentlemen. Thank you very much.  Case will be submitted.